JUDGE CROTTY

'08 CIV 3576

Michael J. Frevola
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200
ATTORNEYS FOR PLAINTIFF
TANGSHAN SCHIJICHENHUI IRON AND STEEL PRODUCTS CO., LTD.

RECEIVED
APR 1 4 2008
SDC S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TANGSHAN SCHIJICHENHUI IRON AND
STEEL PRODUCTS CO., LTD.,

Plaintiff,

-against-

LORDS POLYMER (I) PVT. LTD.,
BLUE FLEET MANAGEMENT CO. LTD.,
BLUE FLEET CHARTERING S.A., and
BELINDA BLUE OCEAN INC.,

Defendants.

---

08 Civ. _____

**VERIFIED
COMPLAINT**

---

Plaintiff, Tangshan Shijichenhui Iron and Steel Products Co. Ltd. ("Tangshan" or

"Plaintiff"), by and through its attorneys, Holland & Knight LLP, for its verified complaint

against Lords Polymer (I) Pvt. Ltd. ("Lords Polymer"), Blue Fleet Management Co. Ltd. ("Blue

Fleet Management"), Blue Fleet Chartering S.A. ("Blue Fleet Chartering"), and Belinda Blue

Ocean Inc. ("Belinda Blue") (collectively "Defendants"), alleges as follows:

1.    This is a case of admiralty and maritime jurisdiction as hereinafter more fully

appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil

Procedure.

2.     At all times material herein, plaintiff Tangshan was and is a business entity organized and existing under the laws of the People's Republic of China and maintains a place of business at Banbidian, Kaiping District, Tangshan, Hebei, China.

3.     Upon information and belief, at all times material herein, defendant Lords Polymer is and was a business entity organized and existing under the laws of India with an address at Chatterjee International Center, 33A, Jaharlal Nehru Road, 4th Floor, Suite No. A4, Kolkata – 700071, India.

4.     Upon information and belief, at all times material herein, defendant Blue Fleet Management is and was a business entity organized and existing under the laws of Greece with an address at 98 Doiranis Street, Kallithea, 176 72 Athens, Greece.

5.     Upon information and belief, at all times material herein, defendant Blue Fleet Chartering is and was a business entity organized and existing under the laws of Greece with an address at 98 Doiranis Street, Kallithea, 176 72 Athens, Greece.

6.     Upon information and belief, at all times material herein, defendant Belinda Blue is and was a business entity organized and existing under the laws of North Korea with an address at 98 Doiranis Street, Kallithea, 176 72 Athens, Greece.

## COUNT I

## BREACH OF CONTRACT AGAINST LORDS POLYMER

7.     On or about November 8, 2007, Tangshan entered into a contract ("the Contract") with Lords Polymer for the sale and delivery of approximately 16,000 metric tons of iron ore fines ("the Cargo").  A copy of the Contract, as well as two supplements to the Contract, is annexed as Exhibit 1.

8.     Under the terms of the Contract, Lords Polymer was to sell, transport via vessel, and deliver the Cargo to Lords Polymer at a port in China, to be nominated by Tangshan. According to the Contract, the period for delivery of the Cargo by Lords Polymer was August 13-20, 2007. Under Supplement 2 of the Contract, the agreed price for the Cargo was $118.50 per ton.

9.     The sale and delivery terms agreed to by the Parties to the Contract required Lords Polymer to charter a vessel for shipment and delivery of the Cargo. In particular, the Contract requires that Lords Polymer deliver the Cargo to Tangshan at a discharge port in China:

> Delivery of any Ore sold under this Agreement shall be deemed to have been made at the time of discharge of the Ore from vessel's discharging devices or any shore devices used at Discharge Port provided by Buyer.

Contract ¶ 9(A).

10.    Lords Polymer bears the risk of loss, damage, or destruction of the Cargo until it was delivered to Tangshan at a discharge port in China:

> All risks of loss, damage or destruction to or of Ore sold under this Agreement or caused by such ore shall pass to Buyer *at the time of passing over the vessels rail at Discharge Port*...To be covered by Seller from the time ore is loaded on board the vessel for 110% of the whole cargo covering risks under ICC and additional war and strikes from loading port to destination.

Contract ¶ 9(B, C) (emphasis added).

11.    Lords Polymer loaded 16,502 metric tons on board the M/V LADY BELINDA (the "Vessel"). Tangshan prepaid for the Cargo by Letter of Credit before it was delivered to the delivery port in China.

12.    Lords Polymer failed to deliver the Cargo to a discharge port in China, and by doing so breached the Contract. As a result of Lord Polymer's breach of contract, Tangshan has lost the price it paid for the Cargo.

## COUNT II

### BREACH OF CONTRACT OR CONVERSION AGAINST BLUE FLEET MANAGEMENT, BLUE FLEET CHARTERING AND BELINDA BLUE

13.     Tangshan incorporates by reference Paragraphs 1 through 12 above.

14.     Lords Polymer entered into a charter party with Blue Fleet Management, as disponent owners, to charter the Vessel delivery of the Cargo to Tangshan at a discharge port in North China (the "Charter").   The Charter included the standard GENCON 94 charter party terms.  The Charter was memorialized by a fixture recap (the "Recap").  The Recap is annexed as Exhibit 2.

15.     The Vessel issued to Lords Polymer the Bill of Lading which reflected the quantity of the Cargo as 16,502 metric tons.

16.     Upon information and belief, after completion of loading, the Vessel proceeded on her voyage at three to four knots before finally losing all propulsion capabilities.  On January 14, 2008, the Vessel was salvaged and towed to Singapore, where it remains to this date.  The Vessel is under Singapore port state control and the Cargo remains aboard the Vessel.

17.     In violation of the Charter, Blue Fleet Management did not deliver the Cargo to Tangshan at the designated port in North China.  Blue Fleet Management has not made any efforts to deliver the Cargo to Tangshan, and the Cargo remains onboard the Vessel in the possession of Blue Fleet Management.

18.     Tangshan has paid for the Cargo and remains the titular and actual owner of the Cargo.  Tangshan has not been paid for the Cargo by anyone.

19.     As a result of Blue Fleet Management's conversion of the Cargo, Tangshan has been damaged in the principal amount of $1,955,487.00 (16,502 mt x $118.50/mt).

### Blue Fleet Chartering's Role as Alter-Ego or Paying Agent

20.     The Recap between Lords Polymer and Blue Fleet Management designates Blue Fleet Chartering as the designated payee.

21.     Defendant Blue Fleet Management uses defendant Blue Fleet Chartering in the Recap as an agent for payment, by which Blue Fleet Chartering accepts payments on behalf of Blue Fleet Management despite Blue Fleet Chartering having paid no apparent consideration to Blue Fleet Management.

22.     Blue Fleet Chartering is not listed in Lloyds Register of Shipowners and cannot be found in on-line searches of the maritime industry.  Blue Fleet Management uses the apparently otherwise dormant Blue Fleet Chartering as an agent for payment or a "pass through" entity for the purpose of insulating Blue Fleet Management from creditors relating to its contracts.

23.     At all material times, there existed such unity of ownership and interest between Defendant Blue Fleet Chartering and Defendant Blue Fleet Management, that no separation exists between them and the corporate form of Defendant Blue Fleet Chartering has been disregarded such that Defendant Blue Fleet Management primarily transacted the business of Defendant Blue Fleet Chartering.

24.     Based on the use of Blue Fleet Chartering as the Blue Fleet Management payment agent, there apparently is a commonality of control and management centered with Blue Fleet Management, and an overlap of officers, directors, and employees.

25.     Because of the lack of information regarding Blue Fleet Chartering and the reference to Blue Fleet Chartering in the Charter Recap, Defendant Blue Fleet Chartering and Defendant Blue Fleet Management have common addresses and common contact information

such that the Defendant Blue Fleet Chartering has no independent corporate identity from the Defendant Blue Fleet Management.

26.    At all material times, Defendant Blue Fleet Management has dominated, controlled, and used the Defendant Blue Fleet Chartering for its own purposes such that there is no meaningful difference between the entities.

27.    Defendant Blue Fleet Management has disregarded the corporate form of Defendant Blue Fleet Chartering to the extent that Defendant Blue Fleet Management, was actually carrying on Blue Fleet Chartering's business and operations as if the same were its own, or vice versa.

28.    Defendant Blue Fleet Management utilizes Defendant Blue Fleet Chartering to transfer funds through, to and from the Southern District of New York on its behalf.

29.    There are reasonable grounds to conclude that Blue Fleet Chartering is the alter-ego or paying agent of Defendant Blue Fleet Management and, therefore, Plaintiff Tangshan has a valid prima facie *in personam* claim against Defendant Blue Fleet Chartering based upon alter ego liability.

### Cumulative Total of Damages and Relief Sought

30.    Tangshan is owed $1,955,487.00 for the amount that it paid for the Cargo it never received.

31.    Under the terms of the Contract, disputes between Tangshan and Lords Polymer are to be submitted for arbitration to the China International Economic and Trade Arbitration Commission of the China Council for the Promotion of International Trade.  Upon information and belief, it will take two years to arbitrate the claim to completion.

32.    Under the parties' arbitration agreement, the prevailing party is entitled to recover its legal fees.   Tangshan also entitled to recover interest on its claims, which amounts are estimated below:

Interest:                          $   205,326.14 ($1,955,487.00 x .0525/year x 2 years)

Arbitration costs          $   400,000.00

Total Principal Claim:        $ 1,955,487.00

Total Sought:                   **$ 2,560,813.14**

33.    Defendants are not found within the Southern District of New York but do have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name of Lords Polymer (I) Pvt. Ltd. and/or Blue Fleet Management Co. Ltd. and/or Blue Fleet Chartering S.A. and/or Belinda Blue Ocean Inc., upon information and belief, at the following financial institutions:  Bank of America, N.A.; Bank of China; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; China Trust Bank; Industrial Bank of Korea; Shin Han Bank; Great Eastern Bank; Nara Bank; United Orient Bank; or any other financial institution within the Southern District of New York.

**WHEREFORE**, Tangshan Shijichenhui Iron and Steel Products Co. Ltd. prays:

1.    That a summons with process of attachment and garnishment may issue against the defendants, Lords Polymer (I) Pvt. Ltd. and/or Blue Fleet Management Co. Ltd. and/or Blue Fleet Chartering S.A. and/or Belinda Blue Ocean Inc.; and if defendants cannot be found, then that their goods, chattels and credits within the district, and particularly all bank accounts and

other property of Lords Polymer (I) Pvt. Ltd. and/or Blue Fleet Management Co. Ltd. and/or

Blue Fleet Chartering S.A. and/or Belinda Blue Ocean Inc. with the financial institutions noted

above in paragraph 33, may be attached in an amount sufficient to answer plaintiff's claim;

2.     That a judgment may be entered in favor of Tangshan Shijichenhui Iron and Steel

Products Co. Ltd. and against Lords Polymer (I) Pvt. Ltd., Blue Fleet Management Co. Ltd.,

Blue Fleet Chartering S.A., and Belinda Blue Ocean Inc. in the amount of $2,560,813.14, and

that a decree of condemnation may be issued against the property and credits of the defendants,

for the amount of plaintiff's claim, with interest and attorneys' fees; and

3.     That this Court grant Tangshan Shijichenhui Iron and Steel Products Co. Ltd.

such other and further relief which it may deem just and proper.

Dated: New York, New York
       April 14, 2008

HOLLAND & KNIGHT LLP

By: _____
    Michael J. Frevola
    195 Broadway
    New York, NY 10007-3189
    Tel:    (212) 513-3200
    Fax:    (212) 385-9010

    *Attorneys for Plaintiff*

## **VERIFICATION**

STATE OF NEW YORK          )

                                         :ss.:

COUNTY OF NEW YORK       )

MICHAEL J. FREVOLA, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for Tangshan Shijichenhui Iron and Steel Products Co. Ltd. ("Plaintiff"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Plaintiff and corresponded with Plaintiff's representatives regarding this matter. I am authorized by Plaintiff to make this verification, and the reason for my making it as opposed to an officer or director of Plaintiff is that there are none within the jurisdiction of this Honorable Court.

_____
                              Michael J. Frevola

Sworn to before me this
14th day of April, 2008

_____
Notary Public

**Linda M. Wilkens**
**Notary** Public, State of New York
No. 01WI9672455
Qualified in Queens County
**Certificate** filed in New York County
**Commission** Expires September 30, 2010____

# EXHIBIT 1

# CONTRACT

**CONTRACT NO:006/LP/TLCT/07**

**DATE: 11/08/2007**

**BUYER:**     TANGSHAN SHIJICHENHUI IRON AND STEEL PRODUCTS CO.,LTD.
Banbidian,kaiping District,Tangshan,Hebei,China

**SELLER:**     **M/s LORDS POLYMER (I) PVT. LTD.**
**CHATTERJEE INTERNATIONAL CENTER**
**33A JWAHARLAL NEHERU ROAD**
**4TH FLOOR,SUIT NO.A4**
**KOLKATA - 700 072**

This Contract is made by and between Buyer and Seller whereby Buyer agrees to buy and Seller agrees to sell the undermentioned goods on the terms and conditions stated below:

## 1) INTERPRETATION

In this Agreement, unless the context otherwise requires:
"C.I.F." has the meaning given to such term in the ICC International Rules for the Interpretation of Trade Terms "Inco terms 2000".
"Port of Loading" means the Ports in India.
"Port of Discharge" means the first Port of discharge in China.

## 2) COMMODITY

Name of commodity:     Iron Ore Fines
Country of Origin:     India
Packing:     In Bulk
Port of Loading:     two main ports, India
Port of Destination:     Jingtang, China

## 3) QUANTITY AND DELIVERY PERIOD

18,000Wet Metric Tons(plus/minus 10%) Iron Ore Fines

LAYCAN : 13-20/ August.2007

## 4) SPECIFICATION

| **Chemical Composition** (On dry basis) | **Guaranteed** (by weight) | |
|---|---|---|
| Fe | | 61.50% base /61.00min |
| SiO2 | 5.00% max | |
| Al2O3 | 4.50% max | |
| P | 0.06%max | |
| S | 0.05% max | |

Physical Spectification:Size

| + 10mm | 10.00% Max |
|---|---|
| -0.15mm | 30.00%Max |

Moisture(at 105 deg cent) 8% max

1

## 5) BASE PRICE

Price of US **Dollars106.00**per dry metric ton CIF one main port, China based on 61.50% Fe content, fraction pro rata.

## 6) PRICE ADJUSTMENT

### (A) Fe Content

For each 1.00% of Fe above 61.50%, the base price shall be increased by USD1 per dry metric ton, fractions pro rata. For each 1% of Fe below 61.50%,upto and including 61.00%, the base price shall be decreased by USD1.00 per dry metric ton, fraction pro rata.
Rejection below 61.00%, buyer has the right to refuse to accept the cargo and reject shipment.

### (B) Other Elements

If a shipment does not meet any of the chemical specifications other than Fe, the base price shall be decreased (fractions pro rata) as follows:

**For Excess Phosphorus:**
At the rate of five (5) US cents per dry metric ton for each 0.01 per cent in excess of 0.06 per cent

**For Excess Sulphur:**
At the rate of five (5) US cents per dry metric ton for each 0.01 per cent in excess of 0.05 per cent

**For Excess Alumina:**
At the rate of five (5) US cents per dry  metric  ton for each 1.00 per cent in excess of 4.50 per cent

**For Excess Silica:**
At the rate of five (5) US cents per dry  metric  ton for each 1.00 per cent in excess of 5.00 per cent

### (C)    Physical Specification:

If a shipment does not meet the physical specification provided in Clause 4, the total amount for such shipment shall decrease by

1) US Dollars 0.50 for each metric ton (natural basis) for the quantity of ore    above 10mm in excess of 10% .
2) US Dollars 0.50 for each metric ton (natural basis) for the quantity of ore  below 0.15MM in excess of 30%.

## 7) PAYMENT

(A) Buyer shall open, no later than 17/08/2007, with a Prime Commercial Bank, an irrevocable negotiable letter of credit (L/C) in favors of Seller in an amount in US Dollars sufficient to cover the value of the shipment. All banking charges outside China after establishment of the L/C shall be paid by Seller.

### (B) Provisional Payment

2

The said L/C shall be payable at sight for the amount of ninety-eight (98) per cent of CIF value accompanied by the documents referred to in Clause 8 for first drawing.

(C) **Final Payment.**
The balance due to the Buyer after provisional payment shall be payable by T/T against final invoice and copy of CIQ certificates. The final invoice is to be based on CIQ certificate(s) as provided in Clause 12 and Clause 13. If Seller does not receive the original CIQ certificate within 60 days after completing discharge at destination port, the loading results shall be used for issuing final invoice. If umpire analysis is required payment adjustment arising from this will be made when the Umpire's certificate is available.

## 8) DOCUMENTS

Seller shall, as soon as practical after the delivery of a shipment to Buyer, forward to Buyer the following documents in respect of that shipment.

(A) Full set of "Clean On Board" ocean bills of lading marked "Freight Payable as per Charter Party " issued to order, blank endorsed and notifying "Applicant"

(B) Signed Provisional Commercial invoice in five originals, indicating contract No and name of vessel.

(C) Certificate of quality in one original and three copies issued by TCRC India Private Limited

(D) Certificate of Weight in one original and three copies issued by TCRC India Private Limited

(E) Certificate of Origin in one original and two copies issued by chamber commerce in India

(F) 1 original +1 copy of Marine cargo insurance policy/certificate covering all risks under ICC and additional war and strikes from loading port to Discharge port for 110% of invoice value.

## 9) INSURANCE, DELIVERY, TITLE AND RISK

    A.   Delivery of any Ore sold under this Agreement shall be deemed to have been made at the time of discharge of the Ore from vessel's discharging devices or any shore devices used at Discharge Port provided by Buyer.

    B. All risks of loss, damage or destruction to or of Ore sold under this Agreement or caused by such ore shall pass to Buyer at the time of passing over the vessels rail at Discharge port. However, the property in and the title to such Ore shall pass to Buyer at the time of payment by Buyer in accordance with Clause 8.

    C. To be covered by Seller from the time ore is loaded on board the vessel for 110% of the whole cargo

3

covering risks under ICC and additional war and strikes from loading port to destination.

D. Seller warrants that at the time of delivery it will have good title to the product and will deliver the product to buyer free and clear of all liens, claims and encumbrances arising prior to the transfer of title to buyer.

E. Seller has taken open cover policy. Under this policy this export consignment will be covered for Marine Insurance. Insurance certificate will be issued for cargo value after providing full details to Insurance company and issuance date of certificate will be later than B/L date. However Insurance policy shall have clause **"Policy cover commence when the goods are loaded on the ocean going vessel and to end after it is delivered the cargo at the port of discharge."** Hence Insurance certificate issuance date after the B/L date is as valid

## 10) DISCHARGING TERMS

A) The vessel chartered by the Seller to perform this shipment will enter the limits of Main Port, nominated port by the Buyer in China. Buyer guarantees one 1 safe port 1 safe berth for performing vessel. It is the Buyer's responsibility to ensure smooth discharge at the guaranteed rate at the berth being always afloat to a maximum permissible draft, when fully loaded at the place of discharge.

B) Buyer shall discharge the vessel at the following rate of 8,000 MT per weather working day of twenty four(24) hours Saturdays, Sundays Holidays included basis.

C) NOR (Notice of Readiness) to be tendered on ATDN SHINC, basis WIPON, WICCON, WIFPON, WIBON.

D) Laytime to commence 12 hours running after vessel arrived at the discharge port, unless used, in which case actual time used to count. In case loading has to be interrupted due to reason of responsibility of the vessel, such time lost shall not count as laytime.

E) All cargo related Customs duties, local taxes, port duties, governmental impost, import levies shall be borne by the buyer entirely.

F) Waiting time, if any due to want of berth at discharge port, for Custom Clearance, independent inspection for draft & weight purpose, or time lost due to any sort of

4

discharge port formalities, shall be included in the laytime. Shifting time, if any, would also count as laytime.

G)    Demurrage at discharging port shall be USD6000 Per Day, Despatch will be half of the demurrage rate. Anytime necessarily required by the vessel, for completion of discharging shall be counted as time used in calculating demurrage/despatch money. Laytime Calculation will be made by Buyer based on Statement of Facts (SOF) issued by the nominated agents at discharge port and to be confirmed and accepted by Seller within 30 days of the vessel sailing discharge port. The demurrage/dispatch to be settled within 60 days by both Buyer and seller.

## 11) ADVISE OF SHIPMENT

Seller shall, upon completion of loading at loading port, advise Buyer within three working day by cable/telex/fax/ of the contract number, name of vessel, name of commodity, approximate invoice value, gross weight, loading and sailing date, Bill of Lading No. & Date.

### 12) NOTIFICATION OF ARRIVAL

Seller shall advise 5(five) days in advance of the estimated date of arrival of the vessel at discharge port specifying the type of vessel and hatch division

The seller shall arrange for the master of the vessel to notify Buyer three notices of the ETA of the vessel at the discharge port. The first of such notice will be given 5(five) days prior to the ETA of the vessel, the second to be given 48(forty eight) hours prior to the ETA and the third to be given 24(twenty four) hours prior to the ETA.

## 13) WEIGHING

(A) At loading port Seller at Seller's expense shall determine the weight of the shipment of ore by draft survey. The weight of ore as ascertained and certified together with Seller's analysis shall be the basis for Seller's invoice. Buyer shall at Buyer's expense have its representative(s) present during the draft survey. Buyer shall, at Buyer's expense apply to CIQ for weighing at the port of destination. The weight of the shipment at discharge port is to be ascertained by draft survey. The weight thus determined by CIQ shall be final as to wet quantity of the shipment.

The dry quantity shall be determined by deducting the free moisture referred to in Clause 13 from such wet quantity. Seller may at Seller's expense have its representative(s) present at the time of such determination.

(B) The CIQ report for weighing is the final for payment.

5

(C) If no draft survey is performed at the discharge port or the CIQ report is not received by Seller within sixty (60) calendar days after vessel arrives at discharge port, Seller's weight certificate will be regarded as final.

## 14) SAMPLING AND ANALYSIS

(A) At loading port Seller shall at Seller's expense, determine the specification of ore and shall provide a certificate showing details of the determination and also the percentage of free moisture loss at 105 degree centigrade. Buyer shall at Buyer's expense have its representative(s) present at the time of such determination. At the port of discharge CIQ shall sample from each shipment and divide it into three parts, one for Buyer, the second for possible need of Seller and the third for possible umpire analysis which shall be sealed and kept by CIQ. Seller may at Seller's expense have its representative(s) present at the time of sampling and analysis. CIQ shall analyse the sample for Buyer and within 60 days of discharge issued and promptly forward to Seller by airmail a certificate showing the percentage of chemical contents, the percentage of free moisture loss at 105 degrees centigrade and the relevant screen analysis.CIQ analysis shall be final except as otherwise provided for in article 12c) of this contract.

(B) If the difference in percentage of Fe content between Buyer's and Seller's analysis made under paragraph (A) of this Clause is more than 0.5 per cent or if there exists a significant difference between two said analyses in respect of anyone or more chemical contents other than Fe, the  SELLER  shall consult with the BUYER to reconcile  such difference. If after consultation between  the BUYER and the SELLER the difference cannot be reconciled, then at the request of the BUYER/SELLER the sample retained with the authorized Assayer at the Discharge Port for possible umpire analysis will be sent to an Umpire Assayer to be agreed between `BUYER' and   the `SELLER' for Umpire Analysis and the result of such Umpire  Analysis shall be final and binding on both the  BUYER and the SELLER.The cost of Umpire Analysis shall be to the account of the Party whose own Analysis negatively differs further from the Umpire Analysis and if the result of such Umpire Analysis is the mean of the Analysis of the BUYER at the discharge port and the Analysis of the SELLER at the load port, then such cost shall be equally borne by both the SELLER and the BUYER.

(C) If no determination of analysis is exercised at the discharge port or the CIQ Report is not received by Seller within sixty (60) calendar days after vessel  arrives at discharge port, Seller's certificate shall  be conclusive as to specification of the ore. The weighing, sampling, chemical analysis, moisture determination and screen analysis performed at the discharge Port by CIQ shall be for Buyer's account. The cost of the umpire analysis shall be for the account of the party whose own analysis differs farther from the umpire analysis, and if the result of such umpire analysis is the mean of the analysis of Buyer and the analysis of Seller then such cost shall be equally borne by both parties.

## 15)    FORCE MAJEURE

In the even of force majeure Seller shall not be held responsible for delay in delivery or non-delivery of the goods but shall notify immediately Buyer by fax and deliver to Buyer by registered mail a certificate issued by government authority or Chamber of Commerce as evidence thereof. If the force majeure lasts over one month, Buyer shall have the right to cancel the tonnage involved. Seller's inability to obtain export license shall not be considered as Force Majeure.

## 15) ARBITRATION

All disputes in connection with this contract or the execution thereof shall be settled by friendly negotiation. If no settlement can be reached, the case in dispute shall then be submitted for arbitration to the China International Economic and Trade Arbitration Commission of the China Council for the Promotion of International Trade in accordance with the Provisional Rules of Procedure of the China International Economic and Trade Arbitration Commission of the China Council for the Promotion of International Trade. The decision made by the commission shall be accepted as final and binding upon both parties. The fee for arbitration shall be borne by losing party unless otherwise awarded by the Commission.

## 16) BANKING CO-ORDINATES
### Seller's Bank:

Bank Name: **STATE BANK OF SAURASTRA**
Address: Battala Branch,Kaveri House,132/1 M.G.Road, Kolkata,India
**Swift: SSAU0000145000000898**
Account Holder:. **LORDS POLYMER (I) PVT.LTD.**
Account No:66014726594

### Buyer's Bank

Bank Name: Agricultural Bank Of China,Tangshan Branch
Address:No.61,West Xinhua Road,Tangshan 063004,Hebei,China
Swift:ABOCCNBJ030
Account Holder:Tangshan Shijichenhui Iron and Steel products Co.,Ltd.
Account No:736001040001850

IN WITNESS WHERE OF, the parties here to have executed this
**Contract No. 006/LP/TLCT/07**

**SELLER:**

**For Lords Polymer (I) Pvt. Ltd.**

*For Lords Polymer (I) Pvt. Ltd.*

*Director*
*Amit Saha*

**BUYER:**
TANGSHAN SHIJICHENHUI IRON AND STEEL PRODUCTS CO.,LTD.

7

# SUPPLEMENT   AGREEMENT

CONTRACT NO:006/LP/TLCT/07
DATE : 29/08/2007


BUYER:TANGSHAN SHIJICHENHUI IRON AND STEEL PRODUCTS CO.,LTD.
        Banbidian,Kaiping District,Tangshan,Hebei,China

SELLER: LORDS POLYMER (I) PVT.LTD.



This Supplement Agreement is made by and between Buyer and Seller whereby

Buyer and Seller agree to amend Contract(NO:006/LP/TLCT/07) as follows:


1.  THIS L/C CAN BE CONFIRMED BY ADVISING BANK.ALL CHARGES
    ARISED FOR ACCOUNT OF BENEFICIARY.
2.  LATEST DATE OF SHIPMENT
070905


For Lords Polymer (I) Pvt. Ltd.

SELLER:

Director
Amir Saha


唐山世纪晨晖钢铁制品有限公司
Tangshan Shijichenhui Iron&Steel Products Co.,Ltd

BUYER:

# SUPPLEMENT   AGREEMENT

L/C NO:030LC070340071
CONTRACT NO: 006/LP/TLCT/07
DATE : 21/09/2007

BUYER:TANGSHAN SHIJICHENHUI IRON AND STEEL PRODUCTS CO.,LTD.
        Banbidian,Kaiping District,Tangshan,Hebei,China

SELLER: LORDS POLYMER (I) PVT.LTD.
        66,D.C.DEY ROAD KOLKATA-700015,INDIA

This Supplement Agreement is made by and between Buyer and Seller whereby

Buyer and Seller agree to amend Contract(NO:006/LP/TLCT/07) as follows:

1.  SPECIFICATION

| Chemical Composition (On dry basis) | Guaranteed (by weight) |
|---|---|
| Fe | 61.00% base /59min |
| SiO2 | 5.00% max |
| Al2O3 | 4.50% max |
| P | 0.06%max |
| S | 0.05% max |

| Physical Spectification:Size | |
|---|---|
| + 10mm | 10.00% Max |
| -0.15mm | 30.00%Max |

Moisture(at 105 deg cent)   8% max

2. BASE PRICE

Price of US Dollars**118.50** per dry metric CIF one main port, China based on
61.00% Fe content, fraction pro rata.

**3.  PRICE ADJUSTMENT**

(A) **Fe Content**

For each 1.00% of Fe above 61.00%, the base price shall be increased by USD1.25 per dry
metric ton, fractions pro rata. For each 1% of Fe below 61.00%,upto and including 59.00%,
the base price shall be decreased by USD2.50 per dry metric ton, fraction pro rata.

Rejection below 59.00%, buyer has the right to refuse to accept the cargo and reject
shipment.

(B) **Other Elements**

If a shipment does not meet any of the chemical specifications other
than Fe, the  base price shall be decreased (fractions pro rata) as follows:

**For Excess Phosphorus:**

At the rate of five (5) US cents per dry metric ton for each 0.01 per cent in excess of 0.06 per cent

**For Excess Sulphur:**

At the rate of five (5) US cents per dry metric ton for each 0.01 per cent in excess    of 0.05 per cent

**For Excess Alumina:**

At the rate of five (5) US cents per dry   metric   ton for each 1.00 per cent in excess of 4.50 per cent

**For Excess Silica:**

At the rate of five (5) US cents per dry   metric   ton for each 1.00 per cent in excess of 5.00 per cent

4.FULL SET OF ORIGINAL CLEAN ON BOARD OCEAN BILLS OF LADING MADE OUT TO ORDER AND BLANK ENDORSED,MAKED 'FREIGHT PREPAID'NOTIFYING APPLICANT.

5.Date and Place of Expiry

071115

5.Latest Date of Shipment:

071011

SELLER:

For Lords Polymer (I) Pvt. Ltd.

Director

Amit Saha

BUYER:

唐山世纪晨晖钢铁制品有限公司

Tangshan Shijichenhui Iron&Steel Products Co.,Ltd

# EXHIBIT 2

AP.ФАΣ :032109571795          06 IOYN 2007 15:15    P1

ΑΠΟ:

## FIXTURE NOTE BETWEEN A/C LORDS POLYMER,KOLKATA AND OWNERS M/S BLUE FLEET MANAGEMENT CO LTD ATHENS, GREECE

1. ALL NEGOTIATIONS / TRADE TO BE KEPT STRICTLY PNC

2. FOR ACCOUNT OF
   LORDS POLYMER   KOLKATA
   INDIA

3 DIS. OWNERS:BLUE FLEET MANAGEMENT CO LTD ATHENS, GREECE

4. PERFORMING VESSEL .
M/V LADY BELINDA  - IMO NR 7046261 / CALL SIGN HMVF 4 /
MMSI NR 445817000
==========
SINGLEDECKER BLT 1971 NORTH KOREAN FLAG DWT :20004 ON 9.48 M
GRT/NRT:12180 /7075 T, LOA/LBP :155.10 M / 146M .
BREADTH :22.80 M DEPTH MOULDED :12.85 GR / BL :22536.44 M3
(OR 795874 FT) / 21618.50 MR (OR 763458 FT) 4 HO/4 HA REGISTRY PORT/NR
WONSAN/3710002 CLASS : K.C.S. (KOREAN CLASSIFICATION SOCIETY)
PANDI : NAVIGATOR UK - H&M INSURANCE ; ARDAF ALL AFT
HOLDS CAPACITY
----
HO1 4505.65 M3
HO2 6034.19 M3
HO3 6064.31 M3
HO4 5942.29 M3
HATCH TYPE :PANTOON
HATCH HEIGHT :1.735 M
HATCH MEASUREMENT
----
HA1 19.46 X 10.5 M
HA2 18.5  X 10.5 M
HA3 18.5  X 10.5 M
HA4 18.5  X 10.5 M
SERVICE SPEED / 13.0 KNT ON FO / DO : 22 MT / 1 MT IN PORT
OWNERS CONFIRM VSL IS SUITABLE TO LOAD IRON ORE FINES

5. CARGO & QTY :18,000  MTS +/-10 % IRON ORE FINES  IN BULK

6. LOAD PORT -1SP HALDIA A/O 1SP PARADIP CHOPTS
{ IN HALDIA THE VSL SHALL LOAD MECHANICAL LOADING UPTO  FULL CAPACITY SUBJECT
PERMISSIBLE DRAFT AT HALDIA  }

7. DISCHARGE PORT -1 SP 1 / 2 SB PORT  NORTH CHINA  INCLD YANGTZE RIVER PORT
IN CHOPT   AND DISCHARGE PORT TB DECLAR BEFORE VSL PASSING SPORE (EXCLUDING
XINGANG)

8. LAYCAN 07-25 JUNE 2007

9. FREIGHT
USD 22.50 PMT FIOST BSS  1/1 ( PARADIP TO N CHINA INCLD YANGTZE RIVER PORT  )
USD 25.50 PMT BSS 2 / 1( HALDIA+PARADIP  TO N CHINA INCLD YANGTZE RIVER PORT)

10. LOAD RATE :
   HALDIA  : 4000  MT PWWD SHINC  AT BERTH  BSS MECHANICAL LOADING
   PARADIP : 8000  MT PWWD SHINC  AT BERTH  BSS GRLSS - BUT OWS TO PAY SHORE CRANE
   CHRGS

ANY TRIMMING REQUIRED IN EXCESS OF WHAT CAN BE POSSIBLE WITH THE GRABS IS TO





BE FOR OWNERS ACCOUNT AND TIME OWNERS TO PROVIDE ALL EQUIPMENT AND CREW AS ON BOARD TO FACILITATE THE LOADING/DISCHARGING OPERATIONS .TIME LOST FOR DRAFT SURVEY NOT TO COUNT AS LAYTIME.

LAYTIME CEASE TO COUNT UPON COMPLETION OF LOADING AT EACH PORT/BERTH. CHARTERERS HAVE FREE 3 HOURS FOR CARGO DOCUMENTS PREPARATION WHICH ARE NOT COUNTED AS LAYTIME OR TIME ON DEMURRAGE. IF TIME EXCEED 3 HOURS THEN TIME TO START COUNTING.

FOR DELAY IN DOCUMENTN DUE TO VSLS REASONS SAME TO BE ON OWNERS A/C.SHFTING TIME FROM ANCHORAGE TO BERTH AT BOTH LD AND DISPORTS NOT TO COUNT AS USED LAYTIME AND ANY SHIFTING INSIDE PORT DUE TO VESSEL /OWNERS REQRMNT ALWAYS ON OWERS ACCT & TIME

WAITING FOR TIDE TO SHIFT FROM WAITING ANCHORAGE TO BERTH NOT TO COUNT AS LAYTIME. WAITING FOR TIDE TO HAUL OUT / OR TO SAIL FROM FIRST LOAD PORT / BERTH TO SUBSEQUANT LOAD PORT / PORTS / BERTH / BERTHS NOT TO COUNT AS LAYTIME.SHIFTING BETWEEN BERTH TO BERTH AND PORT TO PORT ALWAYS OWNERS A/C AND TIME.

11. DIS RATE :8,000 MT PWWD SHINC AT BERTH.

12. FREIGHT PAYMENT:  100PCT FREIGHT LESS COMM/OAP   TO BE DEDUCTED AND TO BE PAID TO OWNER'S NOMINATED BANK ACCOUNT WITHIN 3 (THREE) BANKING DAYS AFTER COMPLETION OF LOADING.AND AFTER SIGNING AND RELEASING FULL SET OF ORIGINAL" CLEAN ON BOARD " " BS/L MARKED "FREIGHT PAYABLE AS PER CHARTERPARTY. BUT ALWAYS IN CONFORMITY WITH MATES RECEIPT. UPON COMPLETION OF LOADING, OWNERS SHOULD RELEASE THROUGH MASTER OR LOADPORT AGENT WHO MUST BE GIVEN NECESSARY AUTHORISATION FROM BEFOREHAND 'FREIGHT PAYABLE AS PER CHARTER PARTY' BILL OF LADING/S WITHIN 24 HRS ACOL. UPON REMITTING BY CHARTERERS 100% FREIGHT LESS COMM AND OAP  AND RECEIPT BY OWNERS BANK OR RECEIPT OF SWIFT COPY BY OWNERS, THEN OWNERS MUST IMMEDIATELY RELEASE FREIGHT PREPAID BILL OF LADING IF SO REQUIRED BY THE CHARTERERS, AND CHRTRS TO SURRENDER THE 1ST ISSUED 'FREIGHT PAYABLE ..BS/L' IN EXCHANGE . AUTHORITY MUST BE GIVEN BY OWNERS AND MASTER TO CHARTERERS NOMINATED AGENTS TO SIGN /RELEASE BILLS OF LADING ON BEHALF OF THE MASTER.A COPY OF SUCH AUTHORTY TO BE PROVIDED TO CHRTS UPON VSL BERTHING BEFORE COMMENCEMENT OF LOADING.

FREIGHT BENEFICIARY :
1)USD 250,000 ( TWO HUNDRED AND FIFTY THOUSAND USD )
   TO BE PAID TO  COMPGNIE INDO FRANCAISE DE COMMERCE (P) LTD

IF payment is being made from India:
CIFC A/C With - UCO Bank, Overseas Branch ,
Parliament Street , New Delhi-110001
A/C No. 18610500000288

Company Name
COMPGNIE INDO FRANCAISE DE COMMERCE (P) LTD.
Guru Angad Bhawan, 5th Floor,71, Nehru Place,
New Delhi-110019

UCO Bank RTGS No. UCBA0901861 ( RTGS system is used by the bankers to
transfer the funds within the country from one state to another state
through which the amount is transferred within an hour's time)

IF payment is being made from outside India:-
CHARTERERS TO INSTRUCT THIER BANKERS TO CREDIT
AMERICAN EXPRESS BANK NEW YORK
 FOR FURTHER CREDIT TO UCO BANK, MUMBAI TRESURRY
 SWIFT NO.UCBAINBB001 ,
FOR FURTHER CREDIT TO UCO BANK PARLIAMENT STREET , NEWDELHI
 SWIFT NO. UCBAINBB202,
FOR FURTHER CREDIT TO A/C OF M/S COMPAGNIE INDO FRANCAISE DE COMMERCE (P)
LTD. A/C NO 18610500000288.





AP.ΦAE :032109571795          06 IOYN 2007 15:17   P3

ΑΠΟ:

2) BALANCE FRT LESS COMMISSIONS/LESS OAP TO BE PAID TO :
  Beneficiary: BLUE FLEET CHARTERING S.A.
  Account Nbr: 05.22491.000 (USD)
  Iban Nbr: DE98201200000522491000 (USD)
  Beneficiary's Bank: Berenberg Bank, Hamburg.
  S.W.I.F.T.: BEGODEHH
  Covered with: Northern Trust International Banking Corp.,
     New York, N.Y.
  S.W.I.F.T. : CNORUS33XXX

13. OWNERS / MASTER TO GIVE ETA ON FIXING AND 5/3/2 AND DEFINITE 24 HRS ETA
NOTICES TO CHARTERER / RECIEVER AT LOAD AND DISCHARGE PORTS.

14. NOR TO BE TENDERED OFC HRS AT LOAD AND DISPORT BY
CABLE/FAX/TELEX,WIPON, WIBON, WICCON,WIPON.

15. ON TENDERING N.O.R. AT LOAD PORT VSL'S HOLDS & HATCH COVERS ARE TO BE
CLEAN DRY & IN ALL WAYS SUITABLE FOR THE CARRIAGE OF BULK IRON ORE FINES
UPON INSPECTION HATCHES FOUND UNCLEAN, THEN LAYTIME FM TIME REJECTED UNTIL
PASSED NOT TO COUNT.

16. 12 HOURS TURN TIME AT EACH LOAD PORTS (NON REVERSIBLE)

17. OWS AGENT LOADING PORT BUT CHRTS AGENT BONVOYAGE SHIPPING LOGISTICS WILL BE
AUTHORIZED BY OWS TO SUPERVISE LOADING TO ISSUE CGO DOCS I.E. B/LS AND
CGO MANIFEST AGAINST A PAYMENT OF USD 2000 L'SUM , OWNERS. . (BUYERS/CHRTS AGENTS
AT DISCHARGE PORT).

18. DEMURRAGE USD 6,000PDPR / HD WTS BENDS

19. DEM /DES : BENDS TO BE SETTLED  15 WRKNG DAYS ACOD AND ON
SUBMISSIONS OF RELEVANT DOCS SUCH AS SOF AND NOR DULY COUNTERSIGNED BY
SHIPPER FOR LOAD PORT AND RECIEVER FOR DISCH PORT ETC.& LAYTIME COMPUTATION
FROM OWNERS/CHTRS

20. OAP - OWNERS TO CONTRIBUTE USD2000.00 LUMPSUM

21. ANY TAXES/DUES ON VESSEL/FREIGHT TO BE ON OWNERS ACCOUNT.

22. ANY TAXES/DUES ON CARGOW/WHARFAGE TO BE ON CHARTERERS ACCOUNT.

23 .IF QBL IS NOT AVAILABLE AT DISCHARGE UPON VESSEL'S ARRIVAL AT
DIS.PORT,THE CARGO MAY BE RELEASED AGAINST ORIGINAL RECEIVER'S BANK
GUARANTEE,(TO BE APPROVED BY OWNERS & CHARTERERS) OR ALERNATIVELY AGAINST
CHARTERES LOI,CHOP STRICTLY IN ACCORDANCE WITH OWNERS PANDI CLUB
WORDING,OWNERS MAY DISCHARGE CARGO INTO BONDED WAREHOUSE UNDER CUSTOMS
CUSTODY,AGAINST CHTRS WRITTEN AUTHORITY ONLY. THE STORAGE CHARGE AND ANY
ADDITIONAL EXPENSES THEREFROM SHALL BE FOR THE CHARTERERS/RECVRS ACCOUNT.

24. DRAFT RESTRICTIONS AT LOAD PORT AND DIS PORT OWNERS RESPONSIBILITY

25. GA/ARBITRATION IN SPORE AS PER ENGLISH LAW

26. SUB AS PER CHTRS PROFORMA  CP BASED ON GENCON 94

27. CHRTRS HEREBY LIFT ALL SUBJECT CLEAN AND THIS FIXTURE IS SUBJECT TO OWNERS
PROVIDING ALL VSL CERTIFICATES LATEST 4 DAYS PRIOR VSL ARIVAL AT
PARADIP/LOADPORT. INCASE OWNERS FAIL TO PROVIDE VALID CERTIFICATES CHRTRS
INSURANCE COMPANY WILL NOT COVER THE VSL/CARGO, THEREFORE THIS POINT IS
IMPERATIVELY TO BE INSERTED AS PART OF FIXTURE NOTE. INCASE OWS/VSL DONOT





AND:                            AP. ФAE :032109571795          06 IOYN 2007 15:18    P4

HAVE VALID CERTIFICATES ON BOARD THEN LAYTIME SHALL NOT COUNT TILL ALL
CERTIFICATES REVALIDATED AND CHRTRS NEED 48HRS FOR INSURANCE COVER.

28. TOT COMMS 2.5PCT

29. THIS FIXTURE TO BE TREATED PRIVATE AND CONFIDENTIAL AND NOT TO BE
REPORTED TO ANY THIRD PARTY.

30. OWNERS TO CONFIRM THROUGH AGENTS B4 VSL ARRIVAL VSL PNI CLUBS ,CLASS
WORKABLE AT PARADIP L.DPORTS.(ANY LOSS OR ANY TIME LOST DUE TO NON ACCEPTANCE OF
VESSELS DOCUMENTS BY RESPECTIVE LOAD PORT / PORTS AUTHORITY , OWNERS A/C AND
RISK.)

OWNERS  FURNISH ALL COPIES OF RELEVANT CERTIFICATE/DOCUMENTS  AS REQUIRED
BY CHARTERER .

   A) PNI CLUB {OWNERS GUARANTEE THAT THE PNI AND CLASS CERTIFICATES ARE
ACCEPTABLE TO THE RESPECTIVE LOAD PORT AUTHORITIES}
      B) HULL & MACHINERY CERT
      C) ISPS
      D) CLASS CERT
31. .BIMCO ISM CLAUSE INCORPORATED IN CP / BIMCO ISPS CLAUSE INCORPORATED
IN CP

32. OWNERS SHALL PRODUCE TO THE PORT INSURANCE TO COVER  FOR  COMPENSATION
IN RELATION TO FOLLOWINGS

   A) WRECK REMOVAL EXPENSES
   B) POLLUTION DAMAGE CAUSED BY SPILLAGE OF OIL OR  ANY HAZARDOUS AND
NOXIOUS SUBSTANCES  FROM A PROTECTION AND INDEMNITY (P&I) WHICH IS A
MEMBER OF AN  INTERNATIONAL GROUP OF PNI CLUB OR A CLUB DULY APPROVED  BY
THE GOVT. OF INDIA.

C) OWNERS WARRANT VSL IS AND WILL BE MAINTAINED SD/GC, STEEL FLOORED,
SUITABLE  FOR GRAB/PIPE DISCH,-TIGHT/STAUNCH AND IN EVERY WAY SUITABLE TO
PERFORM THE VOYAGE; ABLOSUTELY WATERTIGHT COMPLYING WITH ALL RULES AND
REGULATIONS AT LOAD/DISCH PORTS  IN  TERMS OF LOAD/CARRIAGE/DISCH OF NAMED
CARGO AND HAS ON  BOARD ALL RELEVANT CERTIFICATES EQUIPPED WITH HATCHES
WHICH ARE IN PERFECT WORKING ORDER.

   D) VSL WILL NOT CHANGE NAME/FLAG/CLASS/OWNERSHIP OR P+I CLUB DURING THE
CURRENCY OF THIS  C/P WIO CHRS' PRIOR WRITTEN CONSENT;

   E) VSL/OWNERS TO INTIMATE TO CHRTS  LOAD PORT AGENTS A CONFIRMATION FROM
LAST DIS PORT AGENTS THAT VSL FREE FROM LAST PORT AGENTS/PORT DO NOT HAVE
ANY PENDING PAYMENTS .

   F)  VSL HAS NOT BEEN DETAINED WITHIN THE LAST 6 MONTHS

33. OTHER TERMS AS PER CHTRS PROFORMA CP .

34. OWNERS HAVE OBTAIN A LETTER FROM CIFC(PREVIOUS CHRTS) LETTERHEAD WITH SIGN
STAMP THAT  CIFC CANT DETAIN THE VSL. ALSO CONFIRM CIFC ALLOW THE VSL FROM VIZAG TO
PARADIP  FOR LOADING IRON ORE .

LORDS POLYMER (I) PVT.LTD.



Authorised Signatory

STAMP & SIGNATURE OF OWNERS          STAMP & SIGNATURE OF CHRTS