UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
TANGSHAN SCHIJICHENHUI IRON AND
STEEL PRODUCTS CO., LTD.

                              Plaintiff,

        -against-                                    **08 Civ. 3576 (PAC)**

LORDS POLYMER (I) PVT. LTD., BLUE
FLEET MANAGEMENT CO. LTD., BLUE
FLEET CHARTERING S.A., and BELINDA
BLUE OCEAN INC.,
                              Defendants.
-----------------------------------------------------------------X


**MEMORANDUM OF LAW
IN REPLY OF PLAINTIFF'S OPPOSITION
TO LORDS POLYMER'S MOTION TO VACATE
MARITIME ATTACHMENT AND GARNISHMENT**


**DEORCHIS & PARTNERS, LLP**
61 Broadway, 26th Floor
New York, New York  10006-2802
(212) 344-4700

*Attorneys for Defendant*
LORDS POLYMER (I) PVT. LTD


John A. Orzel

Bradley E. Brook
Brook Law Firm
2828 Donald Douglas Loop North
Santa Monica, CA  90405

*Of Counsel*

## INTRODUCTION

Defendant Lords Polymer (I) Pvt., Ltd., (hereinafter referred to as "Lords") herewith replies to the memorandum of law in opposition to Lords' motion to vacate maritime attachment obtained by plaintiff Tangshan Schijichenhui Iron and Steel Products Co., Ltd., (hereinafter referred to as "plaintiff" or "Tangshan"). In addition, annexed hereto is a further Affirmation in Support by Amit Saha.

## NO MATTER HOW YOU DRESS IT UP
## A SALES CONTRACT IS STILL A SALES CONTRACT

In its opposition to the present motion, plaintiff attempts to bootstrap itself into the Court's jurisdiction by reference to the Supreme Court's decision in *Norfolk Southern Railway Co. v. James N. Kirby, Pty. Ltd.,* 543 U.S. 14 (2004). Plaintiff's reliance is misplaced. In *Kirby*, the question presented was whether the liability limitation in the contract between the party responsible for shipping machinery to an inland facility of General Motors and the party which arranged the shipping extended to a rail carrier which was a subcontractor of the latter party. Just because the casualty involved in that case was a train wreck, the objective of the contract was still the movement of cargo, with a substantial portion of that transportation taking place by sea. *Kirby* simply does not address the question before this Court, whether a sales contract for iron ore which contains an incidental maritime component will support an *ex parte* maritime attachment under Supplemental Rule B.

The contractual underpinning of *Kirby* is not present with regard to the sales contract entered into between Lords and plaintiff. The contract presently before the Court is for the sale and purchase of 18,000 wet metric tons (+ or − 10% at seller's option) of Iron Ore Fines ("Iron Ore") at US $ 106.00 per metric ton, on a CIF one main port in China basis. *Declaration of Amit*

1

*Saha* (hereinafter referred to as "Saha *Decl."*) *at ¶ 3.* On 29th August 2007, Lords and plaintiff amended the sales contract through a Supplement Agreement which confirmed that the new price of Iron Ore would be US $ 118.50 per dry metric ton. *See Saha Decl. 4 and Exhibit B.* Both the original contract and the supplemental contract require that Lords effect delivery of the iron ore at "one main port in China." Plaintiff is not a party to a charter party (transportation) contract, had no input and no rights regarding Lords' selection of a vessel owner with which to enter into the charter party contract and has no rights whatsoever in maritime law in connection with the relationship between Lords and the vessel owner.[1]

The contract at issue before this Court is no different from any contract for the sale of goods that we all enter into on a regular basis. It does not have to be thousands of tons of iron ore, it can be something as simple as buying a new shirt from Eddie Bauer. When you order your merchandise, you also select how you want to have the merchandise delivered, for example, "regular delivery" or "second day air." If you choose second day air, Eddie Bauer arranges with Federal Express or some other courier company to carry the shirt from the warehouse to you. If that shirt is lost in transit, the purchaser does not automatically become a party to a transportation contract. But, that is exactly what the plaintiff is arguing before this Court; just because Lords was required to effect delivery of the iron ore in China, the sales contract "magically" becomes a maritime contract. The contract at issue in this case is no more a maritime contract then the contract to buy the new shirt from Eddie Bauer is an air transportation contract.

Plaintiff bases its argument that the contract for the sale of goods between it and Lords is cognizable within the Court's admiralty jurisdiction upon the fact that "Lords Polymer was required to procure ocean carriage for the Cargo and deliver it to [plaintiff] at a discharge port in

---

[1] In our case, plaintiff is in the same position as was General Motors in the *Kirby* case as neither was a party to the charter (transportation) contract.

China..." *See plaintiff's memorandum of law at page 6.* At best, the contract entered into between Lords and plaintiff contemplates that Lords will have to enter into a maritime charter party contract in order to deliver the iron ore to plaintiff. *See ¶ 14 of plaintiff's amended complaint.* Lords has no maritime obligation with regard to the plaintiff.

As plaintiff concedes at ¶ 14 of the amended complaint, Lords entered into a charter party contract with co-defendant Blue Fleet Management:

> 14.    Lords Polymer entered into a charter party with Blue Fleet Management, as disponent owners, to charter the Vessel delivery of the Cargo to Tangshan at a discharge port in North China (the "Charter"). The Charter included the standard GENCON 94 charter party terms. The Charter was memorialized by a fixture recap (the "Recap"). The Recap is annexed as Exhibit 2.

There is no question that the charter party between Lords and the owners of the vessel is a maritime contract. An agreement to procure a charter party, however, is considered a preliminary contract and not cognizable in the Court's admiralty jurisdiction. 1-XII BENEDICT ON ADMIRALTY § 183; citing *Boyd, Weir & Sewell, Inc. v. Fritzen-Halcyon Lijn,* 709 F. Supp. 77, 79 (S.D.N.Y. 1989).

The charter party entered into with the shipowner gives Lords the use of the vessel for a voyage from India to China. It sets-out the rights and obligations of the owners and Lords. A review of the recap, annexed as Exhibit 2 to plaintiff's amended complaint, however, will show that plaintiff is not a party to that contract. It should be noted that while plaintiff alleges a "violation" of the charter party contract at ¶ 17 of the amended complaint, it bases its right to recover from co-defendant Blue Fleet upon the alleged conversion of the cargo by Blue Fleet. *See ¶ 19 of plaintiff's amended complaint.*

The Fifth Circuit's decision in *Lucky-Goldstar Int'l v. Phibro Energy,* 958 F.2d 58 (5th Cir. 1992) is much closer to the present case than *Kirby.* In *Lucky-Goldstar,* the Fifth Circuit

3

was faced with an alleged breach of a sales contract which contained an incidental maritime component. In holding that the contract was not cognizable under the court's admiralty jurisdiction, the Fifth Circuit noted:

> To support admiralty jurisdiction in a suit for breach of contract, the underlying contract must be wholly maritime. 1 Benedict on Admiralty § 183 at 12-10 (7th Ed.1991). *Kuehne & Nagel v. Geosource, Inc., 874 F.2d 283, 290 (5th Cir.1989).* This contract was not, beyond cavil. A principal purpose of the contract was the land-based sale of over a thousand metric tons of toluene. It is well-established that such a sale of goods by itself would not be "maritime" merely because the seller agrees to ship the goods by sea to the buyer. *Armour & Co. v. Fort Morgan Steamship Co., 270 U.S. 253, 259, 46 S. Ct. 212, 214, 70 L. Ed. 571 (1926)* ("The original contract to purchase, assemble, and sell the cattle, to charter vessels and therein transport the cattle to Jacksonville, and the agreement of compromise, are not maritime contracts"); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co., 754 F.2d 1223, 1231-32 (5th Cir.1985)* ("It is fundamental that the mere inclusion of maritime obligations in a mixed contract does not, without more, bring non-maritime obligations within the pale of admiralty law"); *Luckenbach S.S. Co. v. Gano Moore Co., 298 F. 343, 344 (2d Cir.1923)* (L.Hand, J.), *rev'd in part on other grounds, 298 F. 344 (2d Cir.1924)* ("Nor is it possible to treat a contract of sale as maritime even though its performance involves the carriage of goods on the seas to the place of delivery... In such matters, the whole contract must be maritime in its character, and, when the performance is partly maritime and partly terrene, a court of admiralty will not assume jurisdiction over it, unless the non-maritime features be inconsiderable").

*Lucky-Goldstar,* 958 F.2d. at 59.

The effect that *Kirby* had on the "purely" maritime/mixed contract doctrine and its concomitant jurisdictional analysis is yet to be determined by the courts. However, lower courts are consistent in holding that the rule remains that a court should not exercise maritime jurisdiction over a contract that is not wholly maritime unless its principal objective is maritime or the maritime obligation is capable of being "severed" from the non-maritime obligations and separately enforced. *Folksamerica Reinsurance Co. v. Clean Water of New York,* 413 F.3d 307, 314-315 (2d Cir. 2005); *Capital Yacht Club v. m/v AVIVA*, 409 F. Supp.2d 1 (D.D.C. 2006).

4

***The Primary Objective:***

The Supreme Court in both *Kirby* and its earlier *Exxon v. Central Gulf Lines,* 500 U.S. 603 (1991), emphasized that the purpose and objective of the contract as a whole must determine whether it is maritime. Accordingly, the Court held in *Kirby* that intermodal bills of lading calling for ocean and land transportation were not automatically excluded from the admiralty and maritime jurisdiction of the federal courts by the presence of a land based obligation since the "primary objective is to accomplish the transportation of goods by sea." *Kirby*, 543 U.S. at 24.

As noted throughout, the "primary objective" of the contract before this Court is not maritime transportation. Any "maritime nature" in the contract is incidental to the iron ore sale, simply because the contract calls for the delivery of the iron ore from India to China. It can only be surmised as plaintiff has not submitted any declaration by a witness with personal knowledge, that plaintiff's "principal objective" in entering into the contract must have been the acquisition of iron ore. It is highly doubtful that plaintiff would have agreed to purchase US$1,955,487.00 worth of iron ore just so that it could have something to ship by ocean vessel. The absurdity of the argument is obvious. Plaintiff needed iron ore and bought it from Lords. It was shipped by ocean vessel because that is the most economical means of shipping bulk commodities. Had it been cheaper to ship the iron ore by train, plaintiff would not have cared. The shipping component of the contract was clearly incidental to the "principal objective" which was the acquisition of iron ore.

***The Severable Maritime Component:***

Plaintiff's argument that the "breach" of the maritime components of the sales contract are somehow severable and therefore cognizable within the Court's admiralty jurisdiction are unavailing. Plaintiff urges this Court to find that the sales contract between it and Lords is

maritime or at the very least, that the "maritime portion" of the contract has been breached and that maritime portion of the contract is severable from the non-maritime obligations. *See plaintiff's memorandum of law at page 12.* Plaintiff fails to identify a "severable" maritime obligation in the contract that Lords has "breached."

Certainly, the "maritime" provisions of the contract as identified by plaintiff at page 13 of its memorandum of law, paragraphs 1, 8 and 9-12 have not been breached:

- Paragraph 1 only recites definitions, there is no obligation imposed upon Lords;
- Paragraph 8 deals with the documentation which Lords must provide to plaintiff. There has been no allegation that there was a failure in documentation. As plaintiff alleges that the cargo has been paid for, it must be assumed that the plaintiff's bank was satisfied with the documentation provided. Copies of the bill of lading and the commercial invoice are provided as Exhibits C and D of the Declaration of Amit Saha, a director of Lords in his Declaration in Support of Motion to Vacate. There is no allegation that either of these documents is deficient.
- Paragraph 9 deals with the risk of loss of the cargo and provides that Lords secure insurance to cover the iron ore. There is no allegation that Lords did not procure proper insurance.
- The provisions of paragraph 10 acknowledge that Lords, as the seller, will charter a vessel, but then the actual obligations under the rest of the paragraph deal with obligations of plaintiff, as the buyer under the contract.
- Paragraph 11 simply provides that seller will advise buyer of the particulars of the shipment within three days of the completion of loading.
- Paragraph 12 is another notification provision calling for the seller to arrange for the master of the vessel to give 5-day; 48 hour; and 24 hour notice to the buyer of the vessels estimated time of arrival.

Strictly speaking, the only breach of the contract alleged by plaintiff is that Lords has failed to effect delivery of the 16,502 mt of iron ore. This is nothing more than a land-based failure to deliver goods. There is nothing uniquely maritime about the claim.

As the Supreme Court noted in *Kirby,* the test of maritime contract jurisdiction is whether the contract has reference to a maritime service or maritime transaction:

> To ascertain whether a contract is a maritime one, *we cannot look to whether a ship or other vessel was involved in the dispute,* as we would in a putative maritime tort case. [citations omitted]. Nor can we simply look to the place of the contract's formation or performance. Instead, the answer "depends upon ... the nature and character of the contract," and the true criterion is whether it has *"reference to maritime service or maritime transactions."*

*Kirby,* 543 U.S. at 23-24 (citations omitted) (emphasis added).

The Supreme Court went on to caution that if the "sea" component of a mixed contract was insubstantial, then the contract would not support a finding of maritime jurisdiction. *Kirby,* 543 U.S. at 24. When compared to the sales portion of the contract between Lords and plaintiff, the shipping or "sea" component is insubstantial, if not invisible. Plaintiff's effort to manipulate the characterization of the "loss" of the cargo as one occurring at sea (see page 13 of it memorandum of law) is not factually accurate. There has not been a "loss" of cargo in this case. The cargo is still in existence, on board the vessel at Singapore. In addition, plaintiff knows this fact and has acknowledged that it is the "beneficial owner of the cargo" on board the LADY BELINDA. *See Saha Decl. at ¶ 10 and Exhibit E.*

Maritime and non-maritime obligations are "severable" when the maritime and non-maritime obligations can be separately enforced. *Compagnie Francaise de Navigation a Vapeur v. Bonnasse,* 19 F.2d 777, *cert. denied*, 275 U.S. 551 (1927). See, *Atlantic Mutual Insurance Co. v. Balfour Maclaine Int'l Ltd.,* 775 F.Supp. 101, 105 (S.D.N.Y. 1991) *aff'd* 968 F.2d 196, 199 (2d Cir. 1992).(Maritime and non-maritime elements were separable because obligations under the shore risks coverage were capable of being carved out from the maritime coverage, a separate premium was assessed and paid and the cover did not require ocean transportation for the coverage to attach to stored goods).

The Fifth Circuit has held that maritime and non-maritime obligations of a contract covering land and sea transportation were not severable where the land based operations were substantial, the alleged breach of contract covered both land and sea based elements of the contract and a single fixed freight charge was assessed for all elements of the transportation. *Kuehne & Nagel v. Geosource, Inc.,* 874 F.2d 283, 290 (5th Cir. 1989).

In the present case, the alleged maritime and non-maritime elements of the sales contract are not severable, there is one contract price for the sale of the iron ore, with delivery included in the contract price.

The only reason that this case was brought as a maritime action under F.R.Civ.P. 9 (h) is to enable the plaintiff to take advantage of the Rule B attachment procedures.  While the Rule B procedure is valuable and necessary to protect maritime commerce, this case does not justify its application.  Plaintiff is nothing more than the buyer of iron ore who has a dispute with its seller.  To reward plaintiff's attempt to "create" maritime jurisdiction where none exists will encourage other plaintiffs with land-based claims to try to take advantage of the *ex parte* Rule B procedure to seize property belonging to defendants who have no contact with New York or even the United States.  It will also further clog the docket of this Court.

## CONCLUSION

The claims being asserted by the plaintiff in this action do not fall within the Court's admiralty and maritime jurisdiction. As a result, they do not support the issuance of a process of maritime attachment and garnishment under Supplemental Admiralty Rule B. Defendant Lords Polymer (I) Pvt., Ltd., prays that this Court issue an Order vacating the writ and process of maritime attachment and garnishment issued against it and Order the immediate release, without automatic 10-day stay, of all assets and property belonging to it, including but not limited to all electronic fund transfers restrained in response to said process. Defendant Lords Polymer (I) Pvt. Ltd., also prays for such further and additional relief as may be deemed by the Court as being just and proper.

Dated: New York, New York
       May 19, 2008

                                              Respectfully submitted,
                                              **DeORCHIS & PARTNERS, LLP**
                                              *Attorneys for Defendant*
                                              LORDS POLYMER (I) PVT. LTD.

By                         /S/
                                     John A. Orzel (JO-2420)
                                     61 Broadway, 26th Floor
                                     New York, New York  10006-2802
                                     (212) 344-4700

John A. Orzel

Bradley E. Brook
Brook Law Firm
2828 Donald Douglas Loop North
Santa Monica, CA  90405

*Of Counsel*

*TANGSHAN SCHIJICHENHUI IRON AND STEEL PRODUCTS CO., LTD.  v.*
*LORDS POLYMER (I) PVT. LTD.,  BLUE FLEET MANAGEMENT CO. LTD.,*
*BLUE FLEET CHARTERING S.A., and BELINDA BLUE OCEAN INC.*

*08 Civ. 3576 (PAC)*

FURTHER AFFIRMATION IN SUPPORT OF AMIT SAHA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

TANGSHAN SHIAJICHENHUI IRON AND
STEEL PRODUCTS CO. LTD.,

                         Plaintiff,                         **08 Civ. 3576 (PAC)**

- against -

LORDS POLYMER (I) PVT. LTD.; BLUE FLEET          **AFFIRMATION IN**
MANAGEMENT COMPANY LTD.; BLUE FLEET               **SUPPORT OF MOTION**
CHARTERING S.A.; and BELINDA BLUE                 **TO VACATE MARITIME**
OCEAN INC.,                                       **ATTACHMENT**

                         Defendants,

-----------------------------------------------------------------X


AFFIRMATION OF AMIT SAHA


I, AMIT SAHA, of Lords Polymer Pvt. Ltd. (hereinafter "LORDS") of 33A, Jawaharlal
Nehru Road, Chatterjee International Centre, 4th Floor, Room No. A/4, Kolkata – 700
071 solemnly, sincerely and truly affirm and say as follows :

1. I am a Director of LORDS and I am duly authorized to make this Affirmation on its
   behalf in support of my company's motion to vacate the maritime attachment.

2. I verily believe that the contents of this Affirmation are true to the best of my
   knowledge information and belief being based upon information and documents held
   by LORDS and my personal knowledge as a Director of LORDS.

3. The main business of LORDS is export of iron ore fines from India to China. As
   such contracts are negotiated in U S Dollars, we have been unable to enter into any
   further contracts for the sale of iron ore fines. In addition, since most Chinese buyers

- 1 -

with whom we have dealings require contracts to be on CIF or C&F basis, we have similarly been unable to charter any vessels to transport the goods to be able to fulfill our contracts as shipowners require payment in U.S. Dollars. The result is that our business has come to a complete standstill. We were normally effecting 2/3 shipments totalling 50,000 – 70,000 m.t. per month at an average profit of about US$ 900,000.

4. The immediate losses that we have suffered are as follows :

a) We entered into a contract with Sino Merit Enterprises Ltd. for the sale of 40,000 m.t. iron ore fines for shipment to any main Chinese port within 5th May 2008. As a result of the maritime attachment we were unable to ship the goods and the buyers have claimed US$ 500,000 as damages for non-performance.

b) We entered into a contract with Hiton Resources, Hong Kong. for the sale of 25,000 m.t. iron ore fines for shipment to China within May 2008. As a result of the maritime attachment we were unable to ship the goods and the buyers have claimed US$ 300,000 as damages for non-performance.

c) In respect of both, the above contracts we have also lost our profit estimated at US$ 975,000.

d) We entered into a contract with I.T.G. (China). for the sale of 25,000 m.t. iron ore fines for shipment to China within April 2008. The goods were shipped on the Dana M. As a result of the maritime attachment we were unable to pay freight to the owners of vessel Dana M and the cargo is currently stuck at the discharge port in China and the buyers are refusing to pay for the goods. The value of this consignment was US$ 3,890,327.02. On top we are incurring interest @ 16% p.a. to our bankers. The current indications from our buyers if this is immediately resolved, is they would be expecting a discount of about US$ 40 per m.t. In addition we would have to pay the extra storage charges and customs penalty in China. I therefore,

- 2 -

estimate that our total losses in relation to this contract are in the region of US$ 1,050,551.03.

5. For the above reasons our business has been totally crippled since the maritime attachment was made and I would respectfully ask that the maritime attachment be vacated.

AFFIRMED by the above-named )
AMIT SAHA at Kolkata )
 )
this 19th day of May 2008 )

Solicitor/Notary Public

- 3 -